Filed 2/2/16  Maywood Police Officers Assn. v. City of Maywood CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MAYWOOD POLICE OFFICERS ASSOCIATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF MAYWOOD, <br><br> Defendant and Respondent. | B256417 <br><br> (Los Angeles County <br> Super. Ct. No. BS126962) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Barbara A. Meiers, Judge.  Affirmed.

Gaspard Castillo Harper, Christopher L. Gaspard, Brandi L. Harper, Joseph N. Bolander; Law Offices of Joel W. Baruch, Christopher L. Gaspard, Joel W. Baruch and Corey A. Hall for Plaintiffs and Appellants.

Best Best & Krieger, Howard B. Golds, Cynthia A. Germano and Thomas M. O'Connell for Defendant and Respondent.

_____

This case arises from a city's decision to disband its police department in the wake of a financial crisis. We find the municipality not liable for breach of contract, and affirm the rulings made by the lower court denying a petition for writ of mandate, granting summary judgment in favor of the municipality, and awarding it attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

**Undisputed Material Facts**

### Memoranda of Understanding

In October 2006, defendant and respondent City of Maywood (City) entered into separate Memoranda of Understanding (MOU) with plaintiffs and appellants Maywood Police Officers Association (MPOA) and Maywood Police Mid-Management Association (MPMMA) (collectively appellants).[1] As relevant here, the MOU with the MPOA states that "City hereby agrees not to contract out any members' employment duties during the term of this Agreement." The MOU with the MPMMA does not include this provision. In August 2009, the parties agreed to extend the duration of the MPOA MOU to June 30, 2012, for the purpose of improving the City's cash position by eliminating a July 1, 2009 pay raise and instituting a July 1, 2011 salary adjustment.

### Attorney General Investigation and Lawsuit

From April 2007 to February 2009, the California Department of Justice Attorney General's Civil Rights Enforcement Section (Attorney General) investigated the City's police department. The Attorney General concluded that the police department lacked oversight, failed to recruit and retain qualified chiefs of police, failed to comply with accepted hiring practices, failed to maintain written policies and procedures, and failed to prepare and submit use of force reports or investigate citizen complaints. In its final report, the Attorney General noted as "significant" that there were 14 privately-filed civil actions pending against the City based on officer misconduct, including false arrests, excessive force and sexual assault.

---

[1] The MPOA is the bargaining unit for police officers below the rank of sergeant; the MPMMA is the bargaining unit for sergeants. Appellants also include individually-named police officers.

In June 2009, the Attorney General filed a lawsuit against the City (*People v. City of Maywood* (Super. Ct. L.A. County, 2009) No. BC416522), seeking immediate reform because the conduct engaged in by police officers deprived persons of their constitutional rights. The following month, the City and the Attorney General entered into a stipulated judgment, pursuant to which the City agreed to implement new plans, policies and procedures for the police department relating to hiring, training, complaints and grievances. All sworn personnel were required to carry digital audio recorders in the field and the police department was required to install video cameras in all patrol cars and public spaces of the police department.

**Insurance Coverage**

From 2005 through July 1, 2010, the City received insurance coverage from the California Joint Powers Insurance Authority (CJPIA). The CJPIA provided the City with $50 million per occurrence in liability coverage and $10 million per occurrence in workers' compensation coverage. The City's retention for liability claims was $2.5 million aggregate annually. Between 2005 and 2010, the City's general liability claims totaled in excess of $18.8 million. Of that amount, $17.3 million, or more than 92 percent, were related to liability claims against the City's police department. The City had the highest frequency and severity of liability claims of all 121 CJPIA member agencies during that time period. Between 2005 and 2010, the City's workers' compensation losses attributable to the police department were in excess of $3 million. As of December 31, 2011, the City owed the CJPIA $9,993,178 for retrospective liability coverage payments and $1,217,935 for retrospective workers' compensation payments.

**Performance Improvement Plan**

In July 2009, the CJPIA determined that the City's significant liability claims presented ongoing and unacceptable exposure to the pool of member agencies. This determination was based in part on the Attorney General's final report and the stipulated judgment. The CJPIA placed the City on a Performance Improvement Plan (PIP), a last resort tool to improve unacceptable risk management practices. The PIP was the result of the CJPIA's concern over the City's significant liability claims loss runs and the police

department's history of illegal conduct. The PIP set forth 20 performance standards for the City to complete by September 30, 2011, and provided that if the City did not comply, the CJPIA would cancel its membership in the CJPIA.

Among the requirements in the PIP was that the City hire a permanent city manager and finalize a police servicing agreement with the City of Cudahy, or inform the City of Cudahy that it would not renew the current agreement. Ultimately, the City failed to meet these requirements in the PIP. While the City made an offer of city manager to one of the many candidates interviewed, she withdrew from consideration because of the ongoing insurance issues with the CJPIA. The City eventually hired a permanent city manager, but not by the deadline set in the PIP. The City also approved revisions to its police servicing agreement with the City of Cudahy, but the City of Cudahy did not accept the agreement.

**Cancellation of Coverage**

In December 2009, the City's auditors conducted an annual audit of the City's financial statements for the fiscal year ending June 30, 2009. The audit reflected the City had only $476,755 in unreserved funds and only $111,691 in cash. The CJPIA received a copy of the audit in January 2010, and anticipated that the City's financial condition would only worsen.

On February 1, 2010, the CJPIA notified the City that it intended to cancel its participation in the CJPIA insurance programs effective March 1, 2010. This cancellation date was continued to June 1, 2010, but the CJPIA informed the City that it should seek alternative coverage in the meantime.

A memorandum of the CJPIA's executive committee meeting on May 26, 2010, stated that the City's police department had failed to comply with the requirements of the stipulated judgment, including daily training of officers with training bulletins, provisions of updates and reports to the CJPIA, and noted that in the prior months there were two officer-involved shootings with ongoing investigations that were never reported to the CJPIA. At the meeting, the CJPIA's executive committee was informed by a risk consultant that "it is clear that Maywood chooses or lacks the ability to comply with the

4

PIP and therefore creates a significant exposure to the pool." The CJPIA canceled the City's coverage effective July 1, 2010.

**Alternative Coverage**

In the spring of 2010, prior to the cancellation of its coverage by the CJPIA, the City retained an insurance broker to prepare an application for commercial liability insurance. The proposal submitted by the broker to the City reflected that only one insurer was willing to provide a quote for commercial liability coverage for all City personnel, including police officers. The quote was for $10 million with a per occurrence retention of $2 million and a premium of $1.3 million. In other words, the City would be required to pay the first $2 million of losses on every claim, whereas under the coverage with the CJPIA the City was only responsible for paying the first $2.5 million for all losses annually. The broker was not able to secure a quote for private workers' compensation coverage for the City. The City's only alternative was to seek coverage from the California State Workers' Compensation Fund.

**The City's Finances**

Between 2009 and 2010, the City's average cash receipts were approximately $750,000 per month. While the City received local tax revenues from the state in January and May of each year in the approximate amount of $1.2 million, its monthly operating costs, including payroll and payment of regular bills, ranged between $1.1 and $1.2 million. The cost of the City's police department represented approximately 70 percent of the City's general fund budget. Between the time the budget was adopted by the City council on April 7, 2010, and June 24, 2010, the City's general fund balance had fallen from approximately $400,000 to negative $990,890.

**Disbanding the Police Department**

On June 21, 2010, the City council made the decision to lay off the City's police employees, and effective July 1, 2010, to receive police services from the Los Angeles County Sheriff's Department. Pursuant to the agreement between the City and the County of Los Angeles, the County assumed any liability and costs arising out of police

5

misconduct, thereby reducing the City's financial risk in terms of potential liability claims.

**Procedural History**

On June 15, 2010, the MPOA and MPMMA initiated this action by filing a petition for writ of mandate and request for injunctive relief. On October 7, 2010, appellants filed a first amended petition for writ of mandate and complaint, adding a breach of contract cause of action and individually-named plaintiffs. The lower court denied the petition and transferred the matter to a trial court. Appellants eventually filed a second amended petition and complaint and then a third amended petition and complaint (TAC) adding a cause of action for breach of the implied covenant of good faith and fair dealing. The City's answer to the TAC asserts 20 affirmative defenses.

Appellants filed a motion for summary adjudication on the issues of whether the City breached the MOUs and whether the City's defenses of impossibility and impractically lacked merit. The City simultaneously filed a motion for summary judgment, raising several arguments, including that it had the right to regulate matters of public safety; appellants failed to fully perform their contractual obligations under the MOUs; and the City was legally excused from any obligation to continue operating its police department under the doctrines of sovereign acts, frustration of purpose, impossibility and impracticability.

Following supplemental briefing in which the City raised the issue that the MPOA and the MMPPA lacked standing to sue, the trial court denied appellants' motion and granted summary judgment in favor of the City, in a 30-page ruling.

The trial court later awarded the City its costs in the amount of $19,111.80 against all appellants "jointly and severally." The award of costs was ordered as an amendment to the final judgment. This appeal followed.

**DISCUSSION**

**I. Petition for Writ of Mandate**

Appellants' first amended verified writ petition sought mandamus "compelling the City to comply with the terms of the Memorandum of Understanding between the parties

6

by immediately ceasing its efforts to disband its Police Department and enter into any outside contract for services currently performed by Association members." Because appellants alleged that the MOUs were negotiated between the parties under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.), we review de novo the trial court's denial of the petition. (*Bergeron v. Department of Health Services* (1999) 71 Cal.App.4th 17, 22 ["Because the duty here asserted is one allegedly arising out of statute and/or constitutional guaranty, this court must engage in de novo review of the trial court's refusal to issue the writ"].)

A writ of mandate may only be employed to compel the performance of a duty which is purely ministerial in character. (Code Civ. Proc., § 1085; *Transdyn/Cresci JV v. City and County of San Francisco* (1999) 72 Cal.App.4th 746, 752.) "'A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists.'" (*Ibid.*) If an act involves the exercise of judgment or discretion, it is not ministerial in character and no mandate will lie. (*Jenkins v. Knight* (1956) 46 Cal.2d 220, 223.) Additionally, a petitioner must show "there is not a plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., § 1086.)

The trial court correctly denied the petition for writ of mandate.

First, the act which appellants seek to compel—reconstituting the police department—would require discretionary decisions, not purely ministerial ones. The City disbanded its police department effective July 1, 2010, and appellants filed the first amended writ petition in October 2010. As the trial court noted, an order compelling the City to reconstitute its police department would involve innumerable discretionary decisions, including reallocating scarce financial resources to pay for personnel, equipment, and insurance, deciding which former police officers to rehire and whether they remained qualified, and which new employees to hire.

Second, appellants themselves admitted they had an adequate remedy at law. In their reply to the City's opposition to the writ petition, appellants stated: "Since the

7

Court has broad discretion to fashion appropriate relief, it may consider granting the Petition but instead of requiring the City to put the police department back together, it may order the payment of lost wages and benefits through the time of disbanding (June 30, 2010) until the expiration of the MOU (June 30, 2012) as incidental to the granting of the petition; or the Court may allow instead the parties to proceed on the Breach of Contract cause of action and pursue damages in an action at law."

## II. Motion for Summary Judgment

Appellants contend the trial court erred in granting summary judgment in favor of the City. In its 30-page ruling, the trial court relied on numerous theories to support summary judgment, including that the MPOA and MPMMA lacked standing to seek contract damages on behalf of their individual members; appellants failed to present any evidence that they performed according to the MOUs; the "no contract out" provision is void; and the City did not breach the MOUs because it reasonably exercised its sovereign rights.[2] We need not address all of these theories, however, because we conclude, as did the trial court, that the City is not liable for breach of contract as a matter of law based on the defenses of frustration of purpose, impracticability and impossibility.

### A. Standard of Review

We review a grant of summary judgment de novo. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) We affirm the summary judgment if it is correct on any legal ground applicable to the case. (*Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1071.) The moving defendant may meet its burden on a motion for summary judgment either by showing that one or more elements of a cause of action cannot be established or by showing that there is a complete defense thereto. (Code Civ. Proc., § 437c, subd. (o)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) Once the moving party's burden is met, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of material fact. (*Silva v. Lucky Stores, Inc* (1998) 65 Cal.App.4th 256, 261.) The plaintiff must produce "'substantial'" responsive evidence

---

[2] Indeed, the trial court found that the uncontroverted facts supported nearly all of the City's numerous affirmative defenses.

sufficient to establish a triable issue of fact. (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 417.) "[R]esponsive evidence that gives rise to no more than mere speculation cannot be regarded as substantial, and is insufficient to establish a triable issue of material fact." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 163.)

## B. Frustration of Purpose

The doctrine of frustration of purpose is summarized in the Restatement Second of Contracts, section 265, as follows: "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary."

Here, the actions of the City's police department, which resulted in the City's insolvency and loss of insurance coverage, satisfy these requirements.

The MOUs specifically state in ARTICLE I, Section 1, Preamble: "It is the intent and purpose of this Agreement to assure sound and mutually beneficial working and economic relationships between the parties hereto." The parties entered into the MOUs in 2006. By the time the MOUs were terminated in 2010, there was no mutually beneficial economic working relationship between the parties.

The undisputed facts show that prior to 2010, the City had the highest frequency and severity of liability claims of all 121 CJPIA members, and more than 92 percent (or $17.3 million) were liability claims against the City's police department. As a result, the City owed the CJPIA more than $9 million in retrospective liability coverage payments with more claims pending against the police department. The severity of these liability claims not only meant that the City could not meet its financial obligations as debts became due, but was also a significant factor in the CJPIA's decision to terminate the City's insurance coverage and the inability of the City to find affordable alternative coverage.

Essentially ignoring this evidence, appellants argue they created a triable issue of fact as to whether the City caused the termination of insurance coverage, rather than the

9

police officers. Appellants point to evidence showing the City was unable to timely meet the requirements of the PIP that it hire a permanent city manager and secure a police services contract with the City of Cudahy, and to findings by the Attorney General that the City failed to supervise and monitor the police department and hire qualified chiefs of police.

But, again, appellants ignore undisputed evidence showing that the PIP was in direct response to the frequent and severe liability claims against the police department; the City of Cudahy did not accept the revised police services agreement approved by the City; the City was unable to timely hire a city manager because of the ongoing coverage issues with the CJPIA that the police department had caused through its claims history; and the CJPIA noted in its decision to cancel the City's insurance that the police department had failed to comply with the stipulated judgment and there were two officer-involved shootings that had ongoing investigations. While the Attorney General concluded that the City had not supervised the police department or retained qualified officers, it was the officers who engaged in the misconduct leading to the civil rights violations and claims history.

Appellants also rely on the fact that neither the Attorney General's final report nor the PIP identifies any individual police officers who allegedly committed wrongdoing. But as third party beneficiaries, the individual officers are subject to the same defenses as the unions that represent them. (See Rest.2d, Contracts, § 309, subd. (2) ["If a contract ceases to be binding in whole or in part because of impracticability, public policy, nonoccurrence of a condition, or present or prospective failure of performance, the right of any beneficiary is to that extent discharged or modified"].)

Accordingly, the trial court correctly found that this case involved "a classic frustration of purpose" excusing performance by the City of the MOUs.

### C. Impossibility and Impracticability

The contract defenses of impossibility and impracticability are available if the performance of a contract has become substantially more burdensome than originally anticipated. (Civ. Code, § 1597; Rest.2d, Contracts, § 261 ["Where, after a contract is

10

made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary"].)

As the court explained in *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1336: "'"A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost." [Citation.]' [Citation.] This does not mean that a party can avoid performance simply because it is more costly than anticipated or results in a loss. [Citation.] Impracticability does not require literal impossibility but applies when performance would require excessive and unreasonable expense. [Citation.]"

As the trial court noted, the parties agree that the availability of adequate insurance was an implied condition of the MPOA MOU, the loss of which excused the City's obligation to continue operating the police department.

Appellants claim they nevertheless created triable issues of fact on the City's defenses of impossibility and impracticability. First, they rely on evidence that at the time the MPOA MOU was amended in August 2009 to extend its duration to June 2012, the City had been operating under the PIP for a month. Therefore, appellants argue, the loss of the CJPIA insurance was reasonably foreseeable and the City's failure to remove the no-contract-out provision at the time of the amendment should be treated as an assumption of risk by the City. (*United States v. Winstar Corp.* (1996) 518 U.S. 839, 905–906.) But the undisputed evidence in the parties' separate statements is that the purpose of amending the MPOA MOU was to improve the City's cash position by avoiding a 2009 pay raise and instituting a July 1, 2011 salary adjustment.

Second, appellants argue "the evidence in this case shows that it was unlikely that the City would face even a single incident of a $2M liability," referring to the only alternative commercial coverage available to the City. Appellants cite to the May 26, 2010 memorandum of the CJPIA executive committee, which stated that "Maywood's

11

claim profile continued to show a decrease in frequency and severity. The 08/09 coverage period had 8 claims with a total severity of $1,107,340. The 09/10 coverage period had 4 claims with a total severity of $152,300." According to appellants, "If the same trend continued for the remaining 2 years of the MPOA MOU, the City would have had little difficulty with a $2M liability insurance deductible, or with paying claims as a self-insured entity. So its worst case scenario is tenuous at best, and certainly does not establish impracticability as a matter of law."

The problem with this argument is that it ignores the reality of the CJPIA insurance. The City's liability policies with the CJPIA were written on an "occurrence" basis. This means, for example, that a claim which arose in 2010 might not be reported until 2012, but would still be covered by the 2009-2010 policy. Thus, loss runs presented in May 2010 did not provide a complete picture of the total losses that the City might actually experience. In any event, appellants' assertion that it was "unlikely" that the City would face a single incident of $2 million liability is purely speculation. A triable issue of material fact can only be created by a conflict in the evidence; it is not created by speculation, conjecture, imagination or guesswork. (*Chaknova v. Wilbur-Ellis Co*. (1999) 69 Cal.App.4th 962, 977–978.)

Moreover, the undisputed fact remains that between the time the City's budget was adopted on April 7, 2010, and June 24, 2010, the City's general fund balance had fallen from approximately $400,000 to a negative $990,890. The City would have been fiscally irresponsible and in complete denial of the claims history to gamble on the fact that there would be no or minimal claims filed. The City should not have been forced to choose between maintaining a police department without adequate insurance and risk exposing itself to bankruptcy, on the one hand, and being exposed to contract damages after making a last resort decision to disband the police department due to the loss of insurance and inability to obtain adequate replacement insurance, on the other hand. The City made the only reasonably available decision at the time to ensure that its citizens were provided the essential service of police protection. Performance of the MOUs was excused as a matter of law.

12

### III. Costs

Appellants contend the trial court abused its discretion in awarding costs to the City. We disagree.

First, appellants argue that the court improperly imposed costs against the individual plaintiffs because there was no notice that costs were being sought against them. This argument is without merit. The final judgment names 32 individual plaintiffs and "any and all other employees, association members and/or similarly situated officers," as among those who are to recover nothing from the City, and then awards costs to the City. The City's memorandum of costs on the Judicial Council form, states that it is against "Maywood Police Officers Association, et al." This was sufficient notice that the City was seeking costs against all plaintiffs, including the individuals. Moreover, because the individual plaintiffs joined together as a group and asserted the same theories against the City for breach of contract and breach of the implied covenant of good faith and fair dealing, the trial court rightly awarded joint costs. (*Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1376.)

Second, appellants argue the deposition costs of $12,262.30 should not be imposed against the individuals jointly because the depositions "almost exclusively related to the individual damages" and the City's cost memorandum "lumped" several deposition costs together. "If the items appearing in a cost bill appear to be proper charges, the burden is on the party seeking to tax costs to show that they were not reasonable or necessary." (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.) Appellants have not done so. That the depositions sought to determine the nature and extent of the individual damages claimed does not render the depositions unreasonable or unnecessary. The issue of damages was an essential element of the joint contract claims by the individual plaintiffs. It also appears that deposition costs were grouped together when the depositions were taken on the same date. Appellants' assertion that the costs of taking the depositions of the individuals who joined together to sue the City were unreasonable or should be treated separately when they were jointly alleged is not well taken.

13

## DISPOSITION

The judgment is affirmed.  The City is entitled to its costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
                   ASHMANN-GERST


We concur:


_____, P. J.
      BOREN


_____, J.
      CHAVEZ